```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------- X
                                         :
LUMINANT ENERGY COMPANY LLC,             :      21cv3335 (DLC)
                                         :
                   Plaintiff,            :      OPINION AND ORDER
             -v-                         :
                                         :
KOCH ENERGY SERVICES, LLC,               :
                                         :
                   Defendant.            :
                                         :
---------------------------------------- X
```

Appearances:

For the plaintiff:
Abigail C. Noebels
Susman Godfrey L.L.P.
1000 Louisiana Street
Ste 5100
Houston, TX 77002

Barry Barnett
Elizabeth Ann Aronson
Susman Godfrey LLP
1301 Avenue of the Americas
32nd Floor
New York, NY 10019

For the defendant:
Isaac Nesser
Nathan Goralnik
Michael Barry Carlinsky
Quinn Emanuel
51 Madison Avenue, 22nd Floor
New York, NY 10010

DENISE COTE, District Judge:

    Luminant Energy Company LLC ("Luminant") brings this breach of contract action against Koch Energy Services, LLC ("Koch") for its failure to deliver contracted-for natural gas to

Luminant during a severe winter storm event in Texas in February 2021. Koch moves for dismissal of those portions of the complaint that arise from three "interruptible" gas contracts. For the reasons that follow, Koch's motion is granted with respect to two of the three interruptible gas contracts.

## Background

The following facts are taken from Luminant's complaint and documents properly considered on this motion. The alleged facts are assumed to be true.

Luminant is a power company that operates several natural gas-fueled power generation facilities. Koch is a natural gas supplier.

On July 21, 2015, Luminant and Koch entered a Master Agreement based on a standard form agreement issued by the International Swaps and Derivatives ("ISDA") Association, Inc.[1] The ISDA Agreement includes a Natural Gas Annex (the "Gas Annex"). The Gas Annex defines two terms that are relevant to this motion: "firm" and "interruptible." "Firm" means that "either party may interrupt its performance without liability

---

[1] ISDA is "a global trade association representing participants in the private-negotiated derivatives industry." Banco Espirito Santo, S.A. v. Concessionaria Do Rodoanel Oeste S.A., 951 N.Y.S.2d 19, 22 n.3 (1st Dept. 2012). ISDA creates model contracts for the derivatives industry. See In re Lehman Bros. Holdings Inc., 970 F.3d 91, 96 (2d Cir. 2020) ("An ISDA Master Agreement is a standard form, published by [ISDA], regularly used to govern over-the-counter derivatives transactions.")

only to the extent that such performance is prevented for reasons of Force Majeure." Conversely, "interruptible" means that "either party may interrupt its performance at any time for any reason, whether or not caused by an event of Force Majeure, with no liability."

Each transaction between Luminant and Koch pursuant to the Master Agreement is memorialized in a trade confirmation ("Confirmation"). Each Confirmation incorporates the terms of the Master Agreement and its Gas Annex, stating,

> This confirmation supplements, forms part of, and is subject to, the ISDA Master Agreement with Gas Annex dated 07/21/2015 . . . between [Luminant] and [Koch]. All provisions contained in the [Master Agreement and the Gas Annex] govern this Confirmation except as expressly provided herein.

Each Confirmation sets forth the details of that transaction and states whether that particular sale of gas is "firm" or "interruptible."

In February 2021, Luminant and Koch entered into at least fifteen Confirmations. There is no dispute that twelve of these are "firm" and two are "interruptible" Confirmations. Luminant contends that one of the transactions that Koch claims is "interruptible" -- Confirmation #985125 -- was actually firm before Koch sent Luminant a "revised" Confirmation five days after the date of the Confirmation.

From approximately February 12 through February 19, as an

extreme winter storm hit Texas, there was a surge in demand for power across Texas.  During this time, Luminant relied upon its Confirmations with Koch to run electricity generation facilities at maximum capacity, but Koch failed to deliver natural gas pursuant to at least six of the Confirmations.

The Confirmations each provide a delivery period, a contract quantity, and a price.  For example, firm Confirmation 983204 requires Koch to provide a contract quantity of 15,000 MMBTU per day during the period of February 11 through February 12, 2021 at a fixed price of $20.00/MMBTU.  In contrast, interruptible Confirmation 983205 requires Koch to provide a contract quantity of "up to" 25,000 MMBTU per during the period of February 12 for a fixed practice of $23.00/MMBTU.  All firm Confirmations provide a "contract quantity," while interruptible Confirmations provide a "contract quantity <u>up to</u>" a particular "volume."  (Emphasis added.)

On March 25, Luminant filed a complaint in New York State Court alleging breach of contract and unjust enrichment.  Koch removed this diversity action to federal court on April 16.  On April 23, Koch moved for partial dismissal of the complaint with respect to three Confirmations, as well as of Luminant's unjust enrichment claim.  The motion became fully submitted on June 1.  The parties' submissions did not address the definition of interruptible as contained in the Gas Annex and incorporated

4

into the Confirmations.

An initial pretrial conference was held on June 25. At the conference, this Court granted Koch's motion to dismiss Luminant's unjust enrichment claim. Additionally, this Court requested supplemental briefing on the definition of "interruptible" in the Gas Annex, including materials "that would shed light on what the ISDA was trying to achieve in adopting [that] particular formulation for its form." The parties submitted supplemental briefing on July 12.

## Discussion

When deciding a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), Fed. R. Civ. P., a court "consider[s] the legal sufficiency of the complaint, taking its factual allegations to be true and drawing all reasonable inferences in the plaintiff's favor." Brooklyn Ctr. for Psychotherapy, Inc. v. Philadelphia Indem. Ins. Co., 955 F.3d 305, 310 (2d Cir. 2020) (citation omitted). To survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." Kaplan v. Lebanese Canadian Bank, SAL, 999 F.3d 842, 854 (2d Cir. 2021) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)).

"To state a claim for breach of contract under New York law, the complaint must allege: (i) the formation of a contract

between the parties; (ii) performance by the plaintiff; (iii) failure of defendant to perform; and (iv) damages." Edwards v. Sequoia Fund, Inc., 938 F.3d 8, 12 (2d Cir. 2019) (citation omitted).[2]  Under New York law, "a fundamental objective of contract interpretation is to give effect to the expressed intention of the parties." Matter of MPM Silicones, L.L.C., 874 F.3d 787, 795 (2d Cir. 2017).  The best evidence of what parties to a written agreement intend is what they say in their writing.  Abdullayeva v. Attending Homecare Servs. LLC, 928 F.3d 218, 222 (2d Cir. 2019) (applying New York law).

"The initial inquiry is whether the contractual language, without reference to sources outside the text of the contract, is ambiguous." In re MPM Silicones, 874 F.3d at 795.  "A written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms." Universal Instruments Corp. v. Micro Sys. Eng'g, Inc., 924 F.3d 32, 41 (2d Cir. 2019) (citation omitted).  An ambiguity exists where the terms of the contract "could suggest more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire integrated agreement and who is cognizant of the customs, practices, usages and terminology as generally understood in the particular trade

---

[2] Pursuant to the Master Agreement, New York law governs this action.

6

or business." Orchard Hill Master Fund Ltd. v. SBA Commc'ns Corp., 830 F.3d 152, 156-57 (2d Cir. 2016) (citation omitted). A contract is unambiguous, by contrast, if its language "has a definite and precise meaning . . . [about] which there is no reasonable basis for a difference of opinion." Electra v. 59 Murray Enterprises, Inc., 987 F.3d 233, 245 (2d Cir. 2021). "If the terms of a contract are clear, courts must take care not to alter or go beyond the express terms of the agreement, or to impose obligations on the parties that are not mandated by the unambiguous terms of the agreement itself." Fisher v. SD Prot. Inc., 948 F.3d 593, 606 (2d Cir. 2020) (citation omitted). "At the motion to dismiss stage, a district court may dismiss a breach of contract claim only if the terms of the contract are unambiguous." Edwards v. Sequoia Fund, Inc., 938 F.3d 8, 13 (2d Cir. 2019) (citation omitted).

Koch argues that the plain meaning of the term "interruptible" is that Koch is not liable for failing to deliver gas at any time for any reason. Koch is correct. The definition of "interruptible" in the Gas Annex, which is incorporated into each of the Confirmations, is clear and unambiguous. It allows either the buyer or the seller to curtail interruptible service for any reason and at any time

without incurring any liability.[3]

The drafting history of the Gas Annex confirms this reading. In 1992, the Federal Energy Regulatory Commission's ("FERC") promulgated Order No. 636, which "required all interstate pipelines to 'unbundle' their transportation services from their own natural gas sales and to provide common carriage services to buyers from other sources that wished to ship gas." Gen. Motors Corp. v. Tracy, 519 U.S. 278, 284 (1997). The unbundling of transportation services from natural gas sales "increased transactional contracting work," and the "number of agreements required for moving gas . . . increased exponentially -- from one bundled contract with a single pipeline supplier to a plethora of contracts covering transactions from the wellhead to the burnertip." Karyl Lawson, A Proposal for a Std. Nat. Gas Sales/Purchase Cont., 11 No. 1 Nat. Gas Cont. Newsl. 1 at *1 (1995) (hereinafter, "Lawson").

The increased number of contracts associated with gas sales created a need for standardization. Id. at *3. In 1995, a

---

[3] The Federal Energy Regulatory Commission's Energy Primer is consistent with this reading. It explains that "Firm contracts are different from [interruptible] and baseload contracts in that both parties are legally obligated to either receive or deliver the amount of gas specified in the contract." FERC, Energy Primer 33 (2020). It also notes that interruptible contracts are "the most flexible" and "are usually put in place when either the supply of gas from the seller, or the demand for gas from the buyer, are not guaranteed." Id.

8

drafting committee of the Gas Industry Standard Board ("GISB")[4] created a proposed model contract, which GISB referred to its Standards Development Subcommittee for review.  Id.  The proposed model contract had five types of service with an ascending order of priority in a curtailment situation: Interruptible, Priority Interruptible, Secondary Firm, Primary Firm, and Exchange for Physicals.  1995 Model Contract, Appendix 31 Model Bilateral Master Sales and Purchase Contract, 1995 WL 17784104.  One of the organizers of the drafting committee noted that "Interruptible" service "should always be clearly defined." Lawson at *4.  The organizer also noted that "[a] good working definition is that interruptible carries no liability for interruptions, except for transporter penalties.  To the extent that parties have different levels of interruptible service, the differences should be clearly set forth."  Id.

The proposed model contract was criticized on the ground that the five different categories of service would "impose obligations on both the buyer and seller that are unnecessarily burdensome" and that the curtailment scheme created a "level of

---

[4] GISB was formed in 1992 by the wholesale natural gas industry with the goal of developing "consensus-based business practice standards for the wholesale electric industry as well as the retail natural gas and electric industries."  William P. Boswell, James P. Cargas, North American Energy Standards Board: Legal and Administrative Underpinnings of A Consensus Based Organization, 27 Energy L.J. 147 (2006).

complexity" that was undesirable for a host of reasons, including that it would "invite . . . litigation and painful discovery."  Anthony Pryor, An Alternative Proposed "Spot" Market Model Nat. Gas Purchase/Sales Cont., 11 No. 2 Nat. Gas Cont. Newsl. 1 at 2 (1995) (hereinafter, "Pryor").  In contrast, a "Spot Model" was proposed, which used

> only two types of gas transactions . . . fully interruptible transactions, under which the parties may cease delivery or receipt for any reason without liability; and firm transactions for terms of one month or less, under which nonperformance is excused only by force majeure.

Id.

In 1996, GISB adopted as its Base Contract the "Spot Model," which included only "interruptible" and "firm" service and defined "interruptible" as allowing either party to "interrupt its performance at any time for any reason, whether or not caused by an event of Force Majeure, with no liability." GISB, Base Cont. for Short-Term Sale & Purchase of Nat. Gas § 3.1, Nat. Gas. Cont. Appendix 33 (1998) WL 35076756.

In 2002, the North American Energy Standards Board ("NAESB") replaced GISB.[5]  NAESB republished GISB's Base Contract with the same definition for the term "interruptible."  NAESB,

---

[5] NAESB is an organization that creates standards for the gas and electricity industries, including a "Base Contract" for the sale of energy.  Mark Haedicke, Gas Trading in 2005 &the NAESB Cont., Gas Trading in 2005 and the NAESB Contract, 2005 No. 3 RMMLF-INST Paper No. 9 (2005).

10

Base Cont. for Sale & Purchase of Nat. Gas § 2.20, 2005 WL 6390669.  In 2004, NAESB collaborated with ISDA to create a model contract for physical energy trades that ISDA could use as an annex to its Master Agreement.  ISDA, User's Guide to the 2005 ISDA Commodity Definitions, at 5.  The resulting "Gas Annex" is designed to cover physical gas transactions, "including the purchase or sale of physical gas on a spot or forward basis, or as an option to purchase or sell gas."  Id.  This Gas Annex, which the Confirmations incorporate, retained the same two types of services and the same definition of "interruptible" as the earlier GISB and NAESB Base Contracts.  Thus, the definition of "interruptible" set forth in the Gas Annex was intentional and stemmed from the need to standardize the sale of natural gas and avoid protracted litigation over curtailment.

Luminant makes several arguments in opposition.  First, Luminant argues that the common meaning of "interrupt" refers to a temporary pause in service, not a permanent refusal to perform.  But "interruptible" is defined in the Gas Annex and allows an interruption at any time for any reason.  Luminant's proposed definition is inconsistent with the explicit terms of the Gas Annex which were incorporated into its Confirmations.

Next, Luminant argues that customs of the industry and the parties' course of dealing will show that the parties understood

11

"interruptible" to mean "best efforts," and Luminant intends to present expert testimony and other evidence establishing this understanding. This argument also fails. "Parol evidence -- evidence outside the four corners of the document -- is admissible only if a court finds an ambiguity in the contract." Schron v. Troutman Sanders LLP, 20 N.Y.3d 430, 436 (2013). See also Umbach v. Carrington Inv. Partners (US), LP, 851 F.3d 147, 157 (2d Cir. 2017) ("[I]f the court determines that the contract is clear, the parol evidence rule bars consideration of extrinsic evidence that might undermine the plain language of the agreement.") As explained, the definition of "interruptible" in the Gas Annex is unambiguous.

Luminant also argues that courts have interpretated the term "interruptible" as allowing a seller to interrupt service only when necessary to serve firm customers. But none of the cases on which Luminant relies construe the Gas Annex of the ISDA Master Agreement.[6]

Finally, Luminant argues that allowing Koch to refuse to deliver gas at any time for any reason without liability would render the contract illusory. An illusory contract is "an agreement in which one party gives as consideration a promise that is so insubstantial as to impose no obligation." Lend

---

[6] Indeed, many of these cases were decided before the events of the 1990s described above.

Lease (US) Const. LMB Inc. v. Zurich Am. Ins. Co., 28 N.Y.3d 675, 684 (2017) (citation omitted).  The Gas Annex allows either party to refuse a gas delivery but sets out the terms of the transaction in the event there is a delivery.  This is not an illusory contract.  Instead, it is a commercial agreement between sophisticated parties allowing flexibility in their arrangements.

## Conclusion

Koch's April 23, 2021 partial motion to dismiss is granted in part.  Claims premised on Confirmations 983205 and 983822 are dismissed.  There remains a dispute over whether Confirmation 985125 is in fact for an interruptible delivery and as a result, Koch's motion to dismiss 985125 is denied.  Luminant's requests to amend its complaint -- both of which were made only in footnotes in its briefs -- are denied.  Luminant has not submitted a proposed amended pleading or otherwise demonstrated that any amendment would not be futile.

Dated:    New York, New York
          July 30, 2021

                                    _____
                                         DENISE COTE
                                    United States District Judge